OPINION
Defendant-appellant Douglas Conklin appeals from his conviction and sentence for Importuning. He contends that his conviction is against the manifest weight of the evidence. We conclude, sua sponte, that there is insufficient evidence in this record to support the conviction. Accordingly, the judgment of the trial court is Reversed, and Conklin is ordered Discharged.
 I
The Division of Wildlife received numerous complaints from the public concerning individuals' illicit sexual activity in the Darke County Wildlife Area, specifically same-sex activities. In response to these complaints, the Division implemented an undercover program to target individuals engaging in homosexual activity in the area. On April 20, 2001, Erryl Wohlgamuth, an investigator with the division, approached Conklin. The two engaged in a short conversation, drove to another area of the park, went for a walk, and discussed wildlife. At some point, their conversation turned to sex. Wohlgamuth then arrested Conklin for a violation of R.C.2907.07.
An audio recording of the conversation between Wohlgamuth and Conklin during their walk in the park was received in evidence. We have listened to it. There are minor disagreements between Conklin and the State as to the contents of that recording. Our review of the recording leads us to conclude that Conklin's version of its contents is correct.
After a bench trial, Conklin was convicted, based upon the trial court's conclusion that Conklin had acted recklessly by soliciting Wohlgamuth to engage in sexual activity with him. Conklin was sentenced to 90 days in jail and a $500 fine. All 90 days and $250 of the fine were suspended. Conklin was also ordered to have no similar future violations, prohibited from entering the local wildlife areas for 2 years, placed on unsupervised probation, and ordered to perform 40 hours of community service. Conklin successfully moved to stay execution of his sentence. He now appeals from his conviction and sentence.
 II
Conklin's sole assignment of error is as follows:
 "THE DECISION OF THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE"
Conklin argues that his conviction is against the manifest weight of the evidence because insufficient evidence was presented at trial to support his conviction. Specifically, he argues that the State failed to present sufficient evidence that: (1) his conduct amounted to fighting words; (2) he knew the officer would be offended by his conduct; or (3) his conduct was reckless.
We agree with Conklin. Although Conklin styles his assignment of error as one regarding the weight of evidence and has not assigned as error the insufficiency of the evidence, we are permitted by Crim. R. 52(B) suasponte to recognize plain errors in exceptional circumstances to prevent a miscarriage of justice. Plain error has occurred in this case because Conklin was convicted of Importuning even though there is insufficient evidence in the record to support the conviction. Obviously, the result of the trial would clearly have been otherwise had the error not occurred, the test for plain error. The distinction between manifest weight of the evidence and insufficiency of evidence is important because of the effect of a reversal by this court. State v. Thompkins (1997),78 Ohio St.3d 380, 388. If we find the evidence is insufficient, then Conklin must be discharged, and cannot be retried for the same offense.Id. If, however, we find the conviction is merely against the manifest weight of the evidence, then he is only entitled to a new trial. Id.
To reverse a criminal conviction for Importuning for insufficient evidence, we must conclude, after reviewing the evidence in a light most favorable to the State, that no rational trier of fact could have found that all elements of R.C.2907.07(B) have been proven beyond a reasonable doubt. Id.
R.C.2907.07(B) provides as follows:
 "No person shall solicit a person of the same sex to engage in sexual activity with the offender, when the offender knows such solicitation is offensive to the other person, or is reckless in that regard." (Emphasis added.)
As explained by the Ohio Supreme Court:
 "Under R.C.2907.07(B), persons may not be punished for "solicit[ing] a person of the same sex to engage in sexual activity with the offender, when the offender knows such solicitation is offensive to the other person, or is reckless in that regard," unless the solicitation, by its very utterance, inflicts injury or is likely to provoke the average person to an immediate retaliatory breach of the peace." State v. Phipps (1979), 58 Ohio St.2d 271, paragraph one of the syllabus.
 Phipps places a heavy burden on prosecutors attempting to convict individuals for the offense of Importuning. Indeed, our research reveals only two cases where an individual's conviction for this offense was upheld on appeal. In both cases, an individual of the same sex approached a stranger and almost immediately began propositioning him. For example, in State v. Presley (1992), 81 Ohio App.3d 721, 723, the Twelfth District Court of Appeals affirmed a trial court's determination that a man who stopped in a driveway and asked a 17-year old boy if he wanted to have sex while rubbing his own stomach had committed the offense of Importuning. Similarly, the Eleventh District Court of Appeals upheld a trial court's conviction of a male who approached an undercover agent in a library, invited him to a more secluded area, and almost immediately, and repeatedly, asked him to engage in sexual relations. State v.Caynon (Dec. 21, 1984), Portage App. No. 1431, unreported. These cases are easily distinguished from the one before us, as evidenced by the following colloquy that occurred at trial between Wohlgamuth and defense counsel:
 "Q. The first contact between the two of you was you addressing him.
"A. Sure. Yes.
"* * *
 "Q. And concerning the conversation with Mr. Conklin, as we heard on the tape, he was only initially interested in talking to you about the mushrooms and how he hunted mushrooms in this area before, correct?
"* * *
"A. It appeared that way.
 "Q. And, in fact, that's the only topic that he had discussed up to the initial point where you say, "What you think, man" correct?
 "A. Yes. We [sic] doesn't discuss sexual activity before then.
"* * *
 "Q. Then you after a period of time, he doesn't respond to that. You say, "What you think, man?" He didn't give you an answer to that, did he, at that point?
"A. No.
 "Q. And then after that, a few seconds after a pause you say, "What you thinking," correct?
"A. Correct.
 "Q. His response, of course, to that question,? [sic] "About what," correct?
"A. Yes.
"* * *
 "Q. Okay. Your response, of course, to that question was, "Whatever." That's the way you responded to his question, right?
"A. Yeah.
 "Q. Okay. Implying, of course, to him that could tell you or talk to you about whatever he wanted to talk about. That's what you meant, right?
"A. Yes.
"* * *
 "Q. Right after that question when you said he said, "About what?" You said, "Whatever." He never did answer you specifically the question, "What you thinking?"
"A. I don't think he did.
 "Q. There was a period where the two of you specifically don't say anything for a few minutes. We hear you walking through the woods. He's looking for mushrooms, you're, assuming, walking behind him, and then you make some comment about him being nervous, correct?
"A. Yes.
"* * *
 "Q. He, at that point, turns the conversation back to hunting mushrooms and how many he's found in a certain area, correct?
"A. Yes.
"* * *
 `Q. * * * There's a period of silence and then you ask him, "Whatcha think" again, correct?
"A. Yes.
 "Q. His response was after you say, "Whatcha think?" You say he says, "About." Implying about what, correct?
"A. Okay. Yes.
"* * *
 "Q. And you kind of giggle and sign [sic] or not really giggle but chuckle. You hear a sigh on the tape and at that point in time he asks you a specific question, correct?
"* * *
 "Q. And at no point in time did you walk away from him during any of this conversation, correct?
"A. That's correct * * *.
 `Q. Instead, you continued to ask Mr. Conklin, "Whatcha think" until he finally answered you, correct?
"A. Correct.
 "Q. The question that he asked you as we heard on the tape was, "What? Do you want to have sex or something," correct?
"A. Yes.
"* * *
 "Q. Okay. And would it be a correct statement at that point after he asks you, "What? Do you want to have sex or something," you didn't walk away at that point either, did you?
"A. No.
 "Q. And you didn't tell him that you weren't into that at that point. You didn't indicate that you weren't interested.
"A. That's correct.
"* * *
 "Q. Okay. There was a period of silent [sic] and then you asked him after he says, "What? Do you want to have sex or something," you say, "Like what," correct?
"* * *
"A. Yes.
"* * *
 "Q. At that point, you asked him, "Like what?" It would be safe to assume that he thought you possibly were interested or at least curious in what he was going to say, correct?
"A. I guess that's possible to assume that.
 "Q. Okay. The next question after a period of silence was from Mr. Conklin and he says, "What? Do you want me to give you a blow job?"
"A. I believe he asked me to give him a blow job.
"* * *
 "Q. And you answered that question with a question. You said, "Would I give you one" asking him back his same question, correct?
"* * *
"A. Yes.
"* * *
 "Q. Your reaction was to respond, "I don't know. You got anything to take the edge off a little bit," correct?
"A. Yes. That's correct.
 "Q. At least at that point in time, if not before, would it be safe to assume that he assumed that you were at least a little bit curious or interested in what you two were talking about?
"A. I guess he could assume that.
 "Q. Okay. In fact, after a short period of time, you not only didn't walk away, but you asked him if that's all he wanted. "That's all you want is a blow job?" Is that a correct statement?
"A. That's correct.
 "Q. His response was, "I don't know. What do you want to do?" That was his response back to you, correct?"
The audio tape recording of the conversation referred to in the above-quoted cross-examination is in evidence, and we have listened to it. It is consistent with the above-quoted cross-examination.
Wohlgamuth subsequently arrested Conklin for a violation of R.C.2907.07.
Here we see little more than a delicate dance of courtship with Wohlgamuth making the first move on Conklin. Conklin does not initiate the conversation; nor does he immediately solicit sex even though he is in an area where it is known that men come to engage in sex with other men. Wohlgamuth had pulled up and parked right alongside him and had initiated conversation, and Wohlgamuth, a complete stranger, had readily assented to drive to a different location in the wilderness area and then to go on a walk with Conklin. Much like a sophomore on a first date hoping to get to second base, Conklin fumbles and blunders while waiting for a sign that his advances will not be rejected. Wohlgamuth's somewhat flirtatious manner, as evidenced by the tape, and repeated questions about "Whatcha thinking," addressed to someone he has never met before, suggest an immediate interest in emotional intimacy, at least, and open the door for a sexual invitation. Only after Conklin gets repeated signals of this kind from Wohlgamuth does he make a move.
Like many courts, we question the propriety of R.C.2907.07(B) and its continued vitality. City of Cleveland v. Maistros (2001),145 Ohio App.3d 346, 358 ("R.C.2907.07(B) violates the equal protection guarantees under the United States and Ohio Constitutions"); State v.Thompson (Dec. 22, 2000), Ashtabula App. No. 99-A-0070, unreported (questioning underlying rationale of R.C.2907.07); State v. Perrin
(1991), 62 Ohio Misc.2d 51, 53 (same). The assumptions underlying the constitutionality of the Importuning statute's restriction on free speech — that a same-sex proposition can be expected to provoke a violent response have a Nineteenth Century flavor. Assuming, however, the constitutionality of the Importuning statute, while there may be forms of solicitation, that by their very utterance, inflict injury or provoke the average person to an immediate retaliatory breach of the peace, the facts in this case do not present that situation. As his conversation with Wohlgamuth unfolded, Conklin could reasonably have concluded that a sexual advance would not be offensive, but might be welcome. Because we conclude that no rational trier of fact could have found, from the evidence in this record, that Conklin either knew that his solicitation would be offensive to Wohlgamuth, or that Conklin was reckless in that regard, an essential element of Importuning, the conviction is not supported by sufficient evidence.
Our conclusion that Conklin's conviction is not supported by sufficient evidence renders Conklin's assignment of error moot. App.R.12.
 III
This court having concluded, sua sponte, that the judgment of the trial court is not supported by the evidence in this record, the judgment of the trial court is Reversed, and Conklin is ordered Discharged.
GRADY and YOUNG, JJ., concur.